**SO ORDERED.**

**SIGNED this 14 day of January, 2011.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

___

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **HARVEST OAKS DRIVE ASSOCIATES, LLC,** | **10-03145-8-SWH** |
| **DEBTOR** | |

**ORDER REGARDING OBJECTION TO CLAIM**

The matter before the court is the debtor's objection to a claim filed by CSMC 2006-C5 Strickland Road, LLC, through its special servicer, LNR Partners, LLC (collectively, "CSMC"). Hearings were held in Raleigh, North Carolina, on September 21 and 28, 2010. Supplemental briefs were filed by both CSMC and the debtor, and this matter is ripe for disposition. For the reasons that follow, the objection to claim will be allowed in part and denied in part.

**BACKGROUND**

The debtor, Harvest Oaks Drive Associates, LLC ("Harvest Oaks"), is a North Carolina limited liability company located in Raleigh, North Carolina, and engaged in the business of leasing retail shopping space. CSMC is a successor-in-interest to Column Financial, Inc., the original mortgage lender and holder of a promissory note from Harvest Oaks in the principal amount of

$13,475,000. The promissory note was executed by the debtor in favor of Column Financial, Inc. on August 15, 2006, and secured by a deed of trust, security agreement and financing statement (collectively, the "deed of trust"). In September of 2007, Column Financial assigned its interest in the promissory note and deed of trust to Wells Fargo Financial, N.A. and the assignment was recorded in the Wake County Register of Deeds on October 1, 2007. Debtor's Ex. 9 at p. 1.

From August 2006 until approximately March 2009 the debtor made payments in compliance with the payment schedule set out in the loan documents. The debtor's last full and timely payment occurred in March 2009. Subsequent monthly payments were late or partial, including the payments for April (a full payment, but made late); May (a partial payment insufficient to cover the full amount due, and therefore held until the June payment was received and could fund the May payment); June (balance held in suspense until July payment was received and provided sufficient funds for June payment); and July (again, balance held in suspense until August payment was received and provided sufficient funds for July payment). Resp. by Secured Lender to Debtor's Obj. to Proof of Claim at p. 2, ¶ 4.a ("CSMC Response"). CSMC maintains, and the debtor does not dispute, that the debtor has been in default on its payments since August 11, 2009.

On December 11, 2009, on behalf of Wells Fargo, special servicer LNR Partners, Inc. gave Harvest Oaks written notice that in addition to the debtor's payment default, it also was in default of its obligation to provide the lender with certain financial documents. Debtor's Ex. 11 at p. 2. In response, counsel for Harvest Oaks sent a forbearance proposal dated January 8, 2010. Debtor's Ex. 7. The proposal was rejected in a letter dated January 13, 2010. Debtor's Ex. 8. On that date, LNR Partners, on behalf of Wells Fargo, gave Harvest Oaks written notice that it was in breach of the terms of the note in multiple respects. The debtor, the notice said, "has been and remains in

material default under the Loan Documents since August 11, 2009, when an Event of Default occurred under the Note and Mortgage by reason of the Borrower's failure to pay to the Lender the amounts then due for monthly interest ('Interest') and for monthly tax, insurance and replacement reserves ('Reserves')." Debtor's Ex. 8 at p. 2. In addition, the notice cited the debtor's failure to pay the 2009 real estate tax bill and the debtor's failure to "maintain its status as a single purpose entity" as material defaults, and noted further that the debtor had failed to provide certain financial statements and information. Id. at pp. 2-3. The notice then stated: "Therefore, you are advised that the Maturity Date of the Note is hereby accelerated and the entire indebtedness is declared to be immediately due and payable." Id. at p. 3. The notice sought accrued interest at the default rate of 11.13% per annum (5% plus the note rate of 6.13%) commencing on August 11, 2009, in the per diem amount of $4,166.02. Wells Fargo subsequently assigned its interest to CSMC, which assignment was recorded with the Wake County Register of Deeds. Debtor's Ex. 13 at p. 3.

CSMC initiated a foreclosure on the deed of trust, notice of which was filed on March 1, 2010. Debtor's Ex. 13. The notice of hearing on the foreclosure cited the basis for foreclosure as the following:

> 4. The Current Holder [CSMC] has instructed the Substitute Trustee to institute this foreclosure proceeding pursuant to the power of sale contained in the Deed of Trust because Borrower has been and remains in default under the Loan Documents since August 11, 2009 by reason of Borrower's failure to: (a) pay the amounts then due under the Note and other Loan Documents for (a) monthly interest ("Interest") and for monthly tax, insurance and replacement reserves ("Reserves"); (b) pay the amounts for Interest and Reserves due on September 11, 2009; (c) pay beginning on October 11, 2009 and on the same day of each month thereafter a fixed payment obligation of $81,919.09 for principal ("Principal") and Interest; (d) pay the 2009 real estate tax bill due to Wake County before same became delinquent; (e) maintain its status as a single purpose entity as required by the Loan Documents; and (f) provide certain financial statements as required by the Loan Documents.

Debtor's Ex. 13 at p. 3 ¶ 4.

Harvest Oaks filed a petition under chapter 11 of the Bankruptcy Code on April 20, 2010, before the foreclosure sale took place. On June 18, 2010, CSMC took the Rule 2004 examination of Mr. Max Barbour, the principal of the debtor, and on June 22, 2010, CSMC filed a proof of claim in the amount of $16,743,992.78 ("the claim"). The claim includes approximately $2.5 million dollars in default interest accruing not from the payment default in August 2009, but from the loan's inception on August 16, 2006.

On July 20, 2010, Harvest Oaks filed an objection to CSMC's claim, asserting that the claim 1) fails to account and give credit for an $83,000 payment made by the debtor in August 2009; 2) includes default interest in excess of CSMC's costs, constitutes an unreasonable penalty, is assessed retroactively, and is in reality an attempt to recover a pre-payment penalty; 3) includes late charges to which CSMC was no longer entitled after the note was accelerated and which are, in addition, miscalculated; and 4) fails to provide documentation supporting the assessment of environmental fees, administrative and recording fees, and title premium and expenses.

CSMC represents that the parties have mutually resolved most of the issues forming the basis for the debtor's objection to claim, and that the debtor has stipulated to all elements of the claim except for the claim for pre-petition default interest. Amended Lender's Br. in Reply to Debtor's Br. in Support of Obj. to Proof of Claim at ¶¶ 5, 6 & 8. The remaining issue before the court is whether CSMC is entitled to interest at the default rate and, if so, from what point in time.

## DISCUSSION

Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." CSMC's proof of claim was properly executed and filed and thus "constitute[s] prima facie evidence

4

of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). In response, the debtor filed a timely objection to the claim on multiple grounds, its primary assertion being that the claim for "default interest" constituted an unreasonable penalty and that the parties' agreement did not give authority for "retroactive interest to be charged upon default." Debtor's Objection to Claim at ¶¶ 8-10.

Section 502(b)(1) of the Bankruptcy Code provides:

(b) Except as provided in [other sections], if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that–

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; [or]

(2) such claim is for unmatured interest . . . .

11 U.S.C. § 502(b). The debtor's objection is based not on contested material facts, but rather on CSMC's construction of the parties' agreement and the law applicable to it. The debtor having rebutted the claim's presumptive validity, the burden ultimately rests on CSMC to prove the amount and validity of the claim by a preponderance of the evidence. Stancill v. Harford Sands, Inc. (In re Harford Sands, Inc.), 372 F.3d 637, 640 (4th Cir. 2004); see also In re Law Developers, LLC, Case No. 08-00965-8-JRL (Bankr. E.D.N.C. June 24, 2008) (slip op. at 2) ("If the objecting party produces evidence challenging the proof of claim, the burden shifts back to the claimant to prove the claim's validity.").

**Harvest Oaks' Contentions**

Although the debtor asserted four bases for its objection to claim, virtually all of the matters have reportedly been resolved except for the single but significant question of whether, and if so to what extent, the contractual default rate of interest applies to CSMC's claim. The debtor characterizes CSMC's claim for default interest accruing from August 16, 2006, as an effort to assess a retroactive and punitive charge that is unwarranted by the promissory note, the deed of trust, or applicable statutes. Allowing the recovery of default interest also would go against the "equities of this case," the debtor argues, and would, instead of serving as some reasonable compensation for a creditor's heightened costs and risks in the event of breach, simply punish the debtor for a default that in the debtor's view caused no actual harm to CSMC or its assignors, at least with respect to the warranty default. CSMC should be estopped from asserting that it was misled with respect to the identity of tenants or their lease arrangements, the debtor argues, given that Column Financial and its assignees were entitled to examine and audit the debtor's books and to make site visits.

The debtor contends that this claim for default interest should be evaluated under § 506(b), which provides that

> [t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). The "reasonable" standard, the debtor believes, should apply to default interest on the claim. In sum, the debtor maintains that it owes no default interest at all, and alternatively that if the court finds it does, then the default rate of interest should apply only after the debtor failed

to make a timely payment in August 2009. The default interest sought here, the debtor concludes, is not reasonable and is, under these facts and circumstances, an impermissible penalty.

**CSMC's Contentions**

In response, CSMC argues that their claim is a straightforward pre-petition claim under 11 U.S.C. § 502 and that the default interest accrued pursuant to specific language set out in the promissory note and deed of trust. These documents provide that the agreement shall be construed according to North Carolina law, which expressly authorizes that borrowers and lenders in exempt loan transactions may charge and collect interest at any rate the borrower agrees to pay; thus, according to CSMC, the claim for default interest is allowed by applicable state non-bankruptcy law.

Pursuant to the contractual language set out above, CSMC contends that it is, under North Carolina state law, entitled to characterize both the payment default and the warranty default as "events of default" within the meaning of the promissory note. CSMC argues that it may recover default interest from the date of the loan's inception, when it alleges the warranty default occurred, even though the debtor paid regularly on the mortgage for approximately three years and was current on its interest payments through August 11, 2009.

CSMC sees little significance in the almost four-year delay between the warranty default and its current effort to assert its rights with respect to that default. Because it did not discover the default until the Rule 2004 examination, it argues, it could not have asserted a claim for default interest at any prior time. Only in connection with Mr. Barbour's deposition, CSMC maintains, did it learn that the

> Debtor's inability to service the loan is largely explained by these false and misleading representations and warranties about the projected rent stream. Debtor's false and misleading representations and warranties regarding the affiliate leases constituted Events of Default under section 2.1(e) of the Security Instrument and

>section 1.4 of the Promissory Note occurring when the loan was made and for which there was no grace or cure period. Section 1.4 of the Promissory Note further provides that default interest shall accrue for so long as an Event of Default exists. Therefore, the Claim properly includes interest accruing from the loan's inception on August 16, 2006.

CSMC Response at p. 5, ¶ 4.b.iii.

The payment default issue is a more straightforward one. CSMC claims that it is entitled under the terms of the parties' agreement, the plain language of 11 U.S.C. § 502, and the laws of North Carolina to recover default interest as provided in the contract. With both parties' arguments in mind, the court turns to the applicable statutes and case law.

Whether CSMC is entitled to interest at the default rate and, if so, for what period of time is a question of law to be resolved with reference to the applicable statutes and the court's interpretation of the parties' contractual agreement, the contents of which are not in dispute. Virtually all of the material facts are uncontested, with the exception of CSMC's claim that the debtor made material misrepresentations in connection with the inception of the deed of trust, and the debtor's claim that it did not. Because the court arrives at its holding in reliance only on its construction of the parties' agreement, the court does not need to make or rely on any factual findings with respect to whether there were misrepresentations of this nature and, if there were, whether they also were material. Accordingly, the court makes no findings with regard to those issues.

### **11 U.S.C. § 502 and N.C. Gen. Stat. § 24-9 Apply**

The debtor argues that whether CSMC may recover default interest turns on application of § 506(b), which governs the recovery of interest on oversecured claims. See 11 U.S.C. § 506(b); see also U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) ("The natural reading of [506(b)]

entitles the holder of an oversecured claim to postpetition interest . . . ."); In re Dixon, 228 B.R. 166, 171 (W.D. Va. 1998). The debtor's argument and cases cited, however, specifically pertain to the recovery of postpetition default interest, which CSMC expressly does not seek. The court is not persuaded, and agrees with CSMC that this scenario is governed by 11 U.S.C. § 502 and its provisions for the allowance of claims or interests.

The parties do agree that the court must look to North Carolina state law to determine whether this claim for default interest is outside the parameters allowed by state law. The North Carolina General Statutes allow for default interest on exempt loans, and the debtor does not contest that the loan falls within the status of exemption. N.C. Gen. Stat. § 24-9(b); see In re Mercer's Enters., Inc., Case No. 04-09168-8-JRL (Bankr. E.D.N.C. Oct. 31, 2005). In Mercer's, the court noted that North Carolina case law did not specifically address default rates of interest, though it has been included without specific comment in judgments awarded by state courts and there is no apparent "state law or policy concern preventing inclusion of default interest in a bankruptcy claim." Mercer's, slip op. at 5 (citing N.C. Gen. Stat. § 24-1.1 (2005)).

North Carolina law thus would, if warranted by the agreement between the parties, allow imposition of default interest subsequent to an event of default under the terms of the promissory note and deed of trust. Having concluded that recovery of default interest is not precluded by applicable law, the court turns to the parties' agreement to determine whether it supports CSMC's claims.

**Construction of the Promissory Note and Deed of Trust**

This court looks first to the language of the relevant loan documents. The promissory note provides, in section 1.4, as follows:

> Event of Default. An "Event of Default" shall be deemed to exist if . . . any Event of Default (as defined in Section 2.1 of the Mortgage) occurs . . . . *Upon the occurrence of an Event of Default*, the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, *shall, at the option of Lender and without notice to Borrower, at once become due and payable and may be collected forthwith*, whether or not there has been a prior demand for payment and regardless of the stipulated Maturity Date. . . . So long as any Event of Default exists hereunder, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note at a rate per annum equal to five percent (5%) plus the interest rate which would be in effect hereunder absent such Event of Default or maturity, or if such increased rate of interest may not be collected under applicable law, then at the maximum rate of interest, if any, which may be collected from Borrower under applicable law (the "Default Interest Rate"), and such default interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty.

Promissory Note, p. 5 at ¶ 1.4 (emphasis added).

Article II of the deed of trust establishes the circumstances that may constitute an "Event of Default." There are many potential circumstances, but the two most relevant to the debtor's remaining objection to claim are these:

> The occurrence of one or more of the following events shall be an "Event of Default" hereunder:
>
> (a)   Borrower fails to (i) make any payment under the Note when due, or (ii) timely make any regularly scheduled monthly deposit into a Reserve when due;
>
> * * *
>
> (e)   Any representation or warranty made herein, in or in connection with any application or commitment relating to the Loan, or in any of the other Loan

> Documents to Lender by Borrower, by any principal, managing member or general partner in Borrower or by any indemnitor or guarantor under any indemnity or guaranty executed in connection with the Loan *is determined by Lender to have been false or misleading in any material respect at the time made*.

Deed of Trust, p. 50 at Article II, ¶ 2.1(a) and (e) (emphasis added). There is no factual dispute that a payment default occurred in August 2009. The debtor contends, however, that CSMC's effort to recover default interest based upon the payment default constitutes an effort to recover an impermissible penalty.

The more hotly contested aspect of the claim for default rate interest pertains to CSMC's assertion that it may recover default interest from the date of the loan's inception, based on what it now perceives as the debtor's inaccurate and incomplete representations at that time. Section 1.1 of Article I of the Deed of Trust sets out the covenants and warranties of the borrower, including a provision pertaining to "rent rolls." The provision warrants that

> Borrower has delivered a true, correct and complete schedule (the "Rent Roll") of all leases affecting the Property (individually, an "Existing Lease" and collectively, the "Existing Leases") as of the date hereof, which accurately and completely sets forth in all material respects for each such Existing Lease, the following: the name of the tenant, the lease expiration date, extension and renewal provisions, the base rent payable, and the Security Deposit held thereunder. Borrower is in compliance with all legal requirements relating to such Security Deposits.

Deed of Trust, p. 8 at Article I, ¶1.1(t). CSMC now alleges that the debtor breached this warranty by failing to provide the original lender with accurate rent rolls at the inception of the loan in August 2006.[1]

---

[1] In particular, CSMC argues that several tenants regularly failed to pay rent in the amount and at the time rents were due. The court notes that the rent roll requirements are very bare bones and do not themselves even pertain to whether a tenant actually complies with the terms of their leases. In any event, as noted above, it is not necessary for the court to make findings of fact on the misrepresentation issue.

At issue, then, is whether the parties' agreement provides authority for CSMC to recover default interest based upon either the payment default, the warranty default, or both. Because the defaults are separate events and derive from separate provisions of the parties' agreement, the court will discuss them separately.

**The Payment Default**

CSMC argues that it is entitled to recover default interest from at least August 11, 2009, which is the date on which the debtor was declared by CSMC's assignor to have been in default by reason of nonpayment, among other things. The deed of trust provides that an event of default occurs when the borrower fails to "make any payment under the Note when due."

Under § 502, a claim for pre-petition interest, including interest at the default rate if provided for in the parties' agreement, will generally be allowed in accordance with the terms of the contract, "subject to the equities of the case." See, e.g., In re Mercer's Enters., Inc., Case No. 04-09168-8-JRL (Bankr. E.D.N.C. Oct. 31, 2005) (explaining that the "equities to be considered under this analysis are the other creditors in the bankruptcy case, and the debtor's attempt at reorganization"). The bankruptcy court for the Middle District of North Carolina also considered whether to allow a claim for interest at the default rate and observed that "whether interest will be allowed at the default rate is determined on a case-by-case basis and is fact specific." In re Deep River Warehouse, Inc., 2005 WL 1513123 *3 (Bankr. M.D.N.C. 2005) (citing In re Dixon, 228 B.R. 166, 174 (W.D. Va. 1998)). The debtor concedes that the general rule, as set out in Dixon and Mercer's, is that "where the circumstances necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral, the presumption in favor of the contract rate has not been rebutted." Dixon, 228 B.R. at 174.

In this case, with respect to the payment default, there are insufficient grounds on which to deviate from the terms set out in the parties' agreement. The claimed default interest would not, in accord with the Dixon factors, exceed the value of the collateral. The debtor did not address the extent to which CSMC's recovery of default interest from August 2009 (the time of the payment default) as opposed to August 2006 (the time of the warranty default), would affect the debtor's ability to reorganize and repay its creditors. The default interest would total approximately $2.5 million based on an August 2006 default, and the debtor argued that CSMC's recovery of *that* sum would "jeopardize" the debtor's ability to reorganize and prejudice unsecured creditors. The debtor did not present evidence indicating that a more modest recovery of default interest, dating from August 2009, would unduly prejudice either its recovery effort or its ability to repay creditors. All told, the purely numerical factors do not provide grounds on which the court should interfere with the award of default interest at the contract rate.

Courts in this district historically also look to the specific factors set out in Deep River Warehouse to determine whether a default interest provision should be enforced:

    (1) the creditor faces a significant risk that the debt will not be paid;

    (2) the lower rate of interest payable pre-default is shown not to be the prevailing market rate;

    (3) the difference between the default and the pre-default rates, and whether the differential between the two rates are reasonable; and

    (4) whether the purpose of the higher interest rate is to compensate the creditor entitled to interest for losses sustained as a result of the fact that it was not paid at maturity or is simply a disguised attempt to penalize the debtor.

Deep River Warehouse, 2005 WL 1513123 at *3-4.

In this case, the evidence presented at the hearing does not suggest a "significant risk" to CSMC that its debt will not be repaid. However, none of the other factors set out in Deep River, or in the other cases cited above, warrant the court's deviation from the presumption that the terms of the contract should apply. The debtor offered no evidence regarding the prevailing market rate of interest or its significance in connection with the lower rate of interest payable pre-default. The difference between the pre-default rate and the default rate is not unreasonably large, and is on the low end compared to differentials approved by other courts. See, e.g., In re Adejobi, 404 B.R. 78, 79 & 83 (Bankr. E.D.N.Y. 2009) (default rate of 24% approved where non-default rate was 9%); In re Schatz, 426 B.R. 24, 27 (Bankr. D.N.H. 2009) (default rate of 18% approved where non-default rate was 7.87%). The default interest rate of 11.13%, which consists of the original rate of 6.13% plus the additional 5% increase, does not demonstrate any contractual overreaching by the lender.

Nor has the debtor demonstrated that the recovery of default interest upon the event of a payment default would be akin to the recovery of a penalty. Reasonable default interest recovered on grounds of a pre-petition payment default, in accordance with the parties' agreed-upon terms, will not constitute a penalty simply because it arises upon default. There must be something more, and as to the payment default, the debtor has not established that the default interest raises equitable concerns. Because the debtor has not established that the default interest rate provided for in the agreement is outside the bounds of established parameters, the debtor's objection to CSMC's claim, insofar as it objects to recovery of interest at the default rate from the August 2009 payment default, will be denied.

**The Warranty Default**

With respect to the warranty default, the debtor has a more compelling argument. The debtor contends that it is unfair and inequitable for CSMC to now assert, at this late stage in the game, the existence of a default taking place at the inception of the loan agreement, after years of inaction on the part of three successive note holders and after the debtor paid interest on the loan, in full compliance with its obligations, for three years. This "retroactive" assertion of default and claim for default interest over the period of time when the debtor was current is inequitable, the debtor argues, and represents an effort to extract a penalty. CSMC contends that the court does not have discretion to alter the default interest rate if it was agreed to in accordance with state law, which this default interest rate was, and argues further that principles of estoppel should not apply.

It is apparent that so long as the debtor was current in its payments, the note holders either did not undertake the inquiries they were entitled to make or, if they did, they elected for unknown reasons not to assert default.[2] As stated earlier, it is not necessary for the court to make factual findings on this point based on the limited evidence provided. Instead, whether CSMC may recover default interest based on an event of default as provided for in the agreement turns, first and foremost, on whether the agreement so authorizes. The court finds that the loan documents themselves define an event of default based on warranty misrepresentations in such a way that there is no basis on which to find the debtor in default as of August 2006.

---

[2] Wells Fargo, CSMC's assignor, became aware of the debtor's principal's practices prior to the debtor's bankruptcy filing and asserted the debtor's breach of a covenant to not engage in loans and advances to other parties as a ground on which to declare the debtor in default, specifically asserting that the debtor failed to maintain its status as a single purpose entity in violation of Sections 1.32 (d), (e) and (o) of the loan documents. Debtor's Ex. 8 at p. 2. However, Wells Fargo did not contend that those practices constituted a default occurring at, or relating back to, any point in time prior to August 11, 2009. Id.

15

The paragraph that defines an event of warranty default, which is Article II ¶ 2.1(e) of the deed of trust, specifically states that an event of default in connection with "[a]ny representation or warranty made . . . in or in connection with any application or commitment relating to the Loan" *occurs* when the representation or warranty "*is determined by Lender to have been false or misleading in any material respect at the time made*." The event of default does *not* occur when the misrepresentation is made. Rather, the event of default occurs when the misrepresentation or warranty "is determined by Lender" to have been false or misleading, at the time made, "in any material respect," which could take place at the time the misrepresentation is made or at some point thereafter. A similar scenario arose in In re Crystal Properties, LTD, L.P., 268 F.3d 743 (9th Cir. 2001), in which the court construed the following language:

> Should default be made in any payment provided for in this note, . . . *at the option of the holder hereof* and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the rate contracted for herein. No delay or omission on the part of the holder hereof in exercising any right hereunder, . . . shall operate as a waiver of any such right or any other right under this note . . . .

Crystal Properties, 268 F.3d at 748 (emphasis added). The right to accelerate the debt, the court concluded, and to recover default interest, was qualified by the word "thereafter." The "use of the word 'thereafter' can only mean that the default interest rate does not become effective unless the holder of the note *exercises its option* to accelerate." Id. (emphasis added). In this case, the contractual language provides that the warranty default occurs when the lender *determines the existence of* a material misrepresentation.

The language of the provision at issue includes two temporal qualifiers. A representation or warranty may constitute a default if it is determined to have been false or misleading "at the time

16

made." And, the actual event of default occurs at the point when the representation or warranty "is determined by Lender" to have been not only false or misleading, but materially so.

CSMC, which currently stands in the shoes of the original lender, maintains that it learned during the course of discovery that the debtor made misrepresentations regarding certain of its tenants and its rent rolls prior to, and in connection with, the execution of the promissory note and deed of trust. Based on the language of the deed of trust, it is apparent that any event of default occurred when CSMC determined that warranties and representations were, when made, materially false or misleading. An event of default occurring at *this* point in time, during the course of this bankruptcy case, obviously will not support recovery of pre-petition default interest.

There also is no real issue of CSMC's alleged waiver of the right to default interest based on the warranty default because the right could not even accrue prior to a lender's determination that a representation had been both false or misleading, and material.[3] This construction of the language is simple and straightforward, and the court finds no ambiguity in this provision of the promissory note. If the language were ambiguous, it would, of course, be construed against CSMC, given that CSMC is the assignee of, and therefore stands in the shoes of, the promissory note's drafter, Column Financial. "[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter – the party responsible for choosing the questionable language."

---

[3] The debtor points out that section 1.28 of the deed of trust provides for a contractual one-year statute of limitations for the debtor to bring "any claim or cause of action . . . arising from or relating to the indebtedness secured hereby." In equity, the debtor argues, CSMC should be held to the same standard. The debtor offers no authority for this position. Because the court determines on other grounds that CSMC may not recover default interest from the date of the loan's inception, the court did not consider this argument.

Novacare Orthotics & Prosthetics E., Inc. v. Speelman, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000).

On that note, it is worth pointing out that other courts have considered the question of an assignee's entitlement to retroactive default interest when the asserted default was overlooked or, for whatever reason, not asserted by the original assignor. In Crystal Properties, discussed above, the appellate court set out the history of the case and quoted, with approval, the bankruptcy court's initial assessment of the real issue:

> [T]he parties cross-moved for summary judgment to determine, *inter alia*, whether Beal was entitled to apply the default interest rate before the date it filed the notices of default. The bankruptcy court held that it was not:
>
>> The real question is, as has always been, can Beal Bank come in as a successor in interest and go back and retroactively apply default interest from a period long before it had any connection with this loan, notwithstanding anything else that went on, and the answer, I think, can't be yes.
>
> The bankruptcy court further reasoned that it would be inequitable to allow Beal to recover the default interest rate in a period during which it was not actively enforced by Beal's predecessors in interest. It concluded that the FDIC and Guardian had waived their right to default interest for the periods in which they were holders of the notes.

268 F.2d at 747.

The Crystal Properties court affirmed the lower courts' grant of summary judgment in favor of the debtor. The appellate court concluded that the assignee in interest could not, under the specific terms of the parties' contract, recover default interest without having given clear and unequivocal notice of its intent to accelerate, even though the notes at issue "expressly state that default interest is due and payable upon default 'without notice or demand.'" Id. Because it based its holding on specific provisions of the parties' contract, as this court does today, the Crystal

18

Properties court did not reach the assignee's appeal of the bankruptcy court's finding that "the principles of waiver and estoppel precluded Beal from applying the default interest rate to the matured loans." Id. at 756.

Similarly, in In re Sweet, 369 B.R. 644 (Bankr. D. Colo. 2007), an assignee of the original note-holder claimed that the terms of the parties' note, which specifically provided that "the Note Holder may *in its discretion* determine all amounts due and owing bear interest at 21%," allowed him "retroactively to apply the 21% default rate of interest to all unpaid balances on the Note beginning from the time the Debtors stopped making payments on the Note, even though [the assignee] was not the holder of the Note at the time the payment default occurred." 369 B.R. at 651 (emphasis in original). The Sweet court found that the original loan holder had never expressed any intent to charge default interest, and that the assignee could not "retroactively substitute his discretion for that of [the original lender] in order to apply default interest to the [notice] when [the lender] first noted a default in the Note." 369 B.R. at 652. The assignee could, under the terms of the note at issue in that case, assert the right to recover default interest as of the date of his purchase of the note. The Sweet court noted that it did not need to consider whether the 21% rate of default interest constituted a penalty because the parties had stipulated that the rate was reasonable. Id.

The court emphasizes that there is no suggestion, and CSMC does not argue, that the debtor intentionally set out to mislead CSMC or its predecessors in interest. All indications are that the misrepresentations alleged to be in breach of the debtor's original warranties were due to careless bookkeeping and the debtor's principal's business practice of allowing his affiliated businesses to skip months of rent and then make large, late payments. The evidence showed that these practices, sloppy though they were, were consistent with the debtor's established way of doing business, and

in fact enabled the debtor to remain current in its payments for three years. Had Column Financial or Wells Fargo exercised their rights to examine the debtor's records or to visit the shopping center, the debtor's tenants' irregular payment patterns would have been readily apparent and the fact that Baileywick Furniture Gallery was not an active tenant would have been obvious. But, because the debtor's payments were current, the lenders, like the debtor, were content to simply carry on.

Finally, the debtor urged the court to consider the equities of the case and argued that allowing CSMC to recover default interest from August 2006 would amount to imposition of an unfair penalty against the debtor and the grant of a financial windfall to CSMC. The court's conclusion that there is no basis upon which CSMC may recover default interest from the debtor from the date of the loan's inception is based upon the plain terms of the parties' agreement, and thus it does not reach the issue of whether CSMC's attempt to recover default interest for the three years in which the debtor performed its payment obligations would in and of itself constitute a penalty.

## CONCLUSION

For the foregoing reasons, the debtor's objection to claim is **DENIED** to the extent that CSMC's claim seeks to recover interest at the default rate from the date of the payment default on August 11, 2009, and is **ALLOWED** to the extent CSMC's claim seeks recovery of interest at the default rate from August 2006 through the date of the payment default.

**SO ORDERED**.

## END OF DOCUMENT